Upon the trial it appeared that the plaintiff was in the service of the defendant as yard-master, and in the performance of his duty was shifting cars in its freight yard. The train of twelve cars, part of them empty, was drawn a short distance up a slight grade toward a switch where part were to be cut off, but the resistance proved too much for the engine and it was stalled. The train was then slowly backed to enable the plaintiff to take off a portion of the cars. To do this he stepped between the third and fourth car, but found a square pin driven fast in a round hole and immovable. He then tried the other, all the time keeping up with the movement of the train; this pin also was tight, and before he could remove it his right foot was caught between the brake-beam of the car behind and the ground. He at once signaled and the engineer attempted to stop, but before he succeeded the plaintiff's other foot caught in a frog, and he was pulled partly down, the car wheel ran upon his leg, and when the train stopped the wheel stood on his knee, which was of course fractured and the leg afterward amputated. Between signaling to stop and the final stroke the plaintiff, pushed also by the brake-beam, had hobbled along on one foot the length of a car and a half, or forty-five feet. He recovered damages upon the ground that the injuries complained of resulted from the defendant's failure, in the exercise of ordinary care, to provide a suitable engine for his use in the work required. It is too well settled to permit discussion, that a *Page 320 
master is under an obligation to use due care to supply its servant with suitable instruments and means to carry on the business intrusted to him. That a locomotive engine was necessary upon occasions like the one in question, that one was furnished, and that it in fact was defective I do not understand to have been controverted. Indeed, at the end of the plaintiff's case, and again at the close of the evidence on both sides, the defendant, in moving for a nonsuit, claimed not that no defect was proven, but "that the evidence failed to establish any defect in the locomotive which contributed to plaintiff's injury;" and again, that "it fails to show that any defect existed in the locomotive of sufficient importance to charge the defendant with knowledge of its existence," or that it was "of a sufficiently serious character to charge the defendant with negligence in permitting the locomotive to be used in its business." By implication certainly the existence of defects was conceded and their effect and consequence only called in question. The motion being denied, the propositions involved in it were submitted to the jury in a charge to which no exception was taken. They were told to inquire, "first, whether the engine in question was actually unsafe or not, and secondly, whether the defendant knew or ought to have known of its condition."
The trial judge also said to them: "It is not only necessary that the plaintiff should satisfy you that the defendant was guilty of negligence, but also that this negligence caused the injury of which he complains." And calling attention to the particulars alleged against the defendant, added: "Did these defects, if they existed, the defect in this throttle-valve, the defect in this main valve, either or both combined, cause this injury?"
He also said: "If you find that the defects existed, that the defendant had notice of them, and that those defects caused this injury, then you reach the third question of fact, and that is whether or not the plaintiff was guilty of any negligence on his part that contributed to this injury," adding "No matter how gross the negligence of the defendant may have been *Page 321 
on the occasion in question, if the plaintiff, by slight negligence on his part, contributed to the injury which he received, he cannot recover." And these questions having been answered by the jury in favor of the plaintiff, the propositions to which the attention of the trial judge was called are restated upon the appellant's points, and upon them the defendant mainly relies to get rid of the finding of the jury. As to the alleged want of care or vigilance on the plaintiff's part, it is enough to say that the evidence was quite sufficient to permit that tribunal to find that there was no departure by him from the line of duty, or the requirements of his service, no recklessness or carelessness on his part, contributory to the accident, or even zeal without knowledge, but on the contrary, a faithful application by him to the work in hand, of the lessons of a long experience in similar operations.
The substantial question is, whether there is evidence reasonably tending to show that the injury resulted from any defect in the engine. Its throttle-valve leaked. So did its main valve, or as it is sometimes called, the valve in the steam chest. Its flues were badly stopped up. The various uses of these parts of the engine are explained by witnesses. The flues connect the fire-box with the smoke-stack and present the radiating surface through which heat is conducted to the water, and steam generated. The throttle-valve admits or shuts off steam from the cylinders, and regulates its supply. The valves in the steam chest are intended to govern the admission and exhaust of steam to and from the cylinder, and when in fit order to perform its function, will admit steam to one end only of the cylinders at one time, and allow its escape from that end as soon as it is admitted to the other, and must cover the steam ports so as not to permit steam to escape from the chest into the exhaust port. The throttle-valve is controlled by the engineer. He may direct the steam into either end of the steam chest and thus give a backward or forward motion to the engine, or exclude it altogether and make it motionless. It is obvious then that it is of the greatest importance that a throttle-valve should remain closed and tight after steam is shut *Page 322 
off. If it opens accidentally by reason of defective gearing, or other cause, or if it is so worn as to leak, that result follows which led to the action of Cone v. Del., Lack. West. R.R.Co. (80 N.Y. 206). There through a leaky valve, steam escaped into the cylinder, the engine was put in motion without the intervention of the engineer, the plaintiff was crushed between two cars, and the defendant, by reason of the unfit condition of the engine, was charged with negligence and held liable for the injury. The evidence shows that the engine in the case at bar was in the same condition. It had more than once before this accident moved off when no person controlled it. It had been left standing, but the steam passed into the cylinder in spite of the adjustment of the valve by the engineer, with intent that it should remain stationary. Speaking of the very time of the accident, one witness says: "Neither the engineer nor any other man could shut the throttle-valve off so that she would stay still;" to effect that, besides placing the lever in the center, it was necessary to block the wheels — a stick placed each side of the driving wheel, so she could go neither one way nor the other. Again: "The throttle-valve leaked whenever the engine was used;" "the throttle would leak so the steam would accumulate in the cylinder, so when you went to throw over" (the lever) "you couldn't, and when you did throw over, she would jump, and you couldn't couple after her with safety as you ought to do;" and illustrating the effect of the unregulated passage of steam through the leaking valve into the chest, the witness says: "You could not depend upon her, if you threw her a little too far ahead she would take a jump, and if you threw her the other way she would jump backwards; at that rate you can't couple cars. If the engine was going backward and you wanted to stop her, the engineer would throw her, and the minute he got over so the steam got over the other side of the piston, he would throw her up in the center; the engine would churn backwards and forwards till the steam got out of the cylinder."
Another witness familiar with the engine and accustomed to its use, states that when wishing to keep it stationary he not *Page 323 
only "hauled her up in the center," but "put a block on each side of the driving wheel and set the brake on the tender." Another witness, an engineer in defendant's employ on and before January 27, 1877, and then running this engine, says: "At that time the engine was in very bad condition; her main valve leaked — that is, the steam blew through; that is what I call leaking; the throttle-valve leaked, and she was a very hard engine to handle. * * * A leaky throttle-valve, to my notion, makes an engine harder to handle and a good deal worse to stop. I think that when the throttle leaks that of course throws the pressure on the valve all the while, when the throttle leaks, and the more pressure on the valves the harder it is to handle the engine; that is my idea of it."
Another, an engineer of abundant experience in the yards of the Central Railroad Company in shifting trains, and whose competency is not disputed, says, in answer to a question embodying the defects referred to, that such an engine is not in a safe condition to do shifting with, because "you wouldn't have control of it." If you receive "a signal to stop, you can't stop any too quick. When you are stopping, if you have an engine with a leaky throttle, moving along slowly, as you would be, of course the steam would act against you; you would naturally have a little momentum, and shut your throttle off with your hand on the lever ready to reverse at the signal, and if that throttle leaked it would be just the same as if the throttle was partially opened and the steam flowing on into the dry pipes, and from the dry pipes into the steam chest, and of course if you reverse your engine you might get it over and you might not. If you are just slacking up to uncouple, and you give her a little steam, and then shut her off and move back by the momentum you have got, a leaky throttle would have the same tendency as though the throttle was open, upon your motion backward it increases your motion as long as you don't reverse your lever. If your lever is in the backward motion and you shut off the throttle, then it she leaks it gives you more momentum, to the extent of the leak." Again the witness says: "A leak in the throttle has the effect upon a locomotive *Page 324 
which would be had if the throttle were partly open, that is to say, there is always some steam passing down to the steam chest, and its effect is solely upon the power of the engineer to manage the lever; it takes the certainty of handling the engine away from him; its effect is to interfere with the management of the locomotive."
As to the existence of these defects, and their importance, therefore, the evidence is overwhelming. Did the defendant have notice of them? Possibly not in words that the valves leaked, that this or that particular part was affected, but of the general weakness and inutility of the engine, reiterated notice. In the first place it was an old engine and repeatedly in the defendant's repair shops. Harvey, who for four years ran for the defendant, and this engine in January, 1877, describes her defects, and asked the master mechanic "to do some work upon her." He said he "was short of engines, and just as quick as he got a chance, he would take the engine and do some work upon her." Some weeks before the accident the plaintiff knew of the engine running away, and that it was not in good condition; what ailed it he did not know, but he reported the engine to Niver, the superintendent. I told him, he says, that "I was not able to do my work with that engine. He asked me what was the matter with her, and I told him I didn't know; so he gave me an order on the master mechanic to give me another engine; but he had nothing to give me in place of it. He gave me an order; that (producing a paper) is the order; he wrote it and signed it." These are its words: "Buchanan, give the yard-master some other engine to do the work. (Signed) W.K. Niver." Niver was a witness for the defendant. He denies nothing of this. Asked by defendant's counsel a single question: "Were you ever notified by anybody, prior to this accident to Mr. Bajus, that that engine as to its valves was out of condition?" he answers: "I have no recollection of ever being notified of any such thing; I have no knowledge of its being out of repair with reference to its valves."
The master mechanic, however, was not unfamiliar with *Page 325 
the seat of probable trouble. Testifying for the defendant, he says, the engine was rebuilt in 1874, the valves were then fixed by facing and surfacing, and three weeks after that she came back for repairs, and her throttle was fixed again, and how often it was at the repair shop after that is not stated.
The evidence disclosed not merely a feeble and inefficient machine, but an impaired one. The trouble was not in its original design, but came from age and wear. It needed repairs. The necessity for them was known by the defendant, but they were not made. Did the defects cause the injury? The circumstances ofCone's Case (supra) illustrate the effect of an untimely application of steam through machinery designed, but which through imperfection failed to shut it off. Those of the case at bar are, in one respect, different. The engineer was at his post, seeking to obey the signal of the plaintiff. He wanted to stop the engine. He changed the lever to the forward motion, and this should have directed the full head of steam into the forward port, and would have done so if the valve had not leaked and so permitted part to go into the other. The travel of the valve is placed under the control of the engineer, that he may employ the greatest power of the engine by admitting steam into the cylinders, or by excluding it, suspend motion, as in his judgment the exigency of the case requires. Unless it responds to his will, the machine is necessarily imperfect. If the steam, without his action, can pass into the port-ways, to some extent he loses control over it, and must overcome its resistance before his own will can be effective. In such a case there is not a mere loss of power, but a misapplication of power. The steam passing out is met by steam coming in, and the motion of the piston is necessarily hindered. So, as we have seen, it is testified to in this case, the engineer in an effort to control the engine "would have," as the witness says, "to operate against all the steam in there" (the chest). "If the throttle-valve had been tight, there would have been no steam in there." Again the witness says: "It is harder to handle an engine when the throttle leaks, than when it does not leak." So, although "you shut *Page 326 
her off in the backward or forward motion, and the throttle leaks, she would go that motion." In other words, the shut-off is not effectual. The steam still enters the chest. Thus it is apparent that these parts of the engine were so worn and out of repair as to defeat the object for which they were constructed, that they caused the machinery to act independently of the control of the engineer, and took from him the power to stop quickly, or make sudden starts, as the emergency of coupling or uncoupling, or making up a train, required. In other words, a machine whose motor was intended to be distinct from its operator and so controllable by him was made by these defects to act automatically both as to power and movements. In its principal operations it was independent. Hence when the plaintiff gave the signal to stop, the engineer sought to do so, but although the train was backing slowly, the engine failed to obey. If sound and in good order, it should have become motionless after a few revolutions of its wheels, or as the jury might have found, in the traverse of less than ten feet. Had it done so, the plaintiff would not have suffered. It actually passed over forty-five feet, and the injury occurred. It surely cannot be said as matter of law that it was not brought on by the incapacity of the engine, by reason of its defective condition, to be subject to the will of the engineer, nor that the steam on which he had a right to rely as a power to do his bidding was not in fact applied in resistance to his intent. Nor can we say that the resistance of the escaping steam, nor the prolonged motion, made inevitable by the unexpected restraint upon the lever, was not the material and efficient cause of the accident, nor that by reason of the leaky throttle-valve, motive power was supplied while the engineer sought and expected to exclude it. To save the plaintiff it was necessary to shut off steam and at once stop the engine. The leaky throttle was, as a throttle partly open, and made that impossible. It might even accelerate and prolong motion, which, except for that, would have been suspended. In any view, the action of the engine was shown to have been unnatural, and its eccentricity due to its defective condition. *Page 327 
It was in evidence that if it had been sound and of normal capacity, the engineer might have so checked and controlled the train as to insure the plaintiff's safety. It was, therefore, for the defendant to prove that the injury was caused without its fault, and to be accounted for by other causes than one produced by its negligence. (Seybolt's Case, 95 N.Y. 562, 570.)
In Flike's Case (53 N.Y. 549) the train had one less than its usual number of men, and the evidence tended to show that if the absentee had been there, he, with the others, could have controlled the impetus of the cars and prevented the accident. The defendant was held liable, the court saying, "as well might the company be relieved if the train had started without an engineer, or without brakes, or with a defective engine." There the injury was occasioned by collision with cars accidentally broken from the train, and the principal protection in such cases was said to be the prompt and efficient application of the brakes, and the defendant held liable because a sufficient number of men to perform that duty were not present. Here we have the defective engine instead of the absent brakeman. In principle the cases are not unlike. In this a sound appliance was lacking; in that the full tale of operators. The contract implied between the parties is the same; the character of the negligence is the same; the consequences of the default the same; and a difference in liability can stand upon neither reason nor authority.
But in any aspect the question presented turns in part at least upon these considerations, and is one of fact; the jurors passing upon it have found that the injury not only came from the defects, but that the consequences were such as might naturally result from them under the circumstances in which the plaintiff was placed, and that the defective condition of the engine was imputable as negligence to the defendant through the non-performance of a positive duty to make those repairs which it knew, or which from their character it might have known, were needed for the efficient and safe operation of the machine. Clearly the evidence was sufficient in some reasonable view to justify these conclusions. It was, therefore, *Page 328 
properly submitted to the jury, and the judgment should be sustained upon the ground warranted by their verdict, that the defendant failed in its duty to furnish to its servant machinery reasonably fit for the use to which it was to be applied, and in a condition not to endanger his safety. To hold otherwise would relieve the defendant from just responsibility to its employes, and go far to abrogate a rule of action which up to this time we have declared to be unqualified, and by which a master is required to use all reasonable care, diligence and caution in providing for the safety of those in his employ, and furnishing for their use in his work, safe, sound and suitable tools, implements, appliances and machinery in the prosecution thereof, and keeping the same in repair (Benzing v. Steinway, 101 N.Y. 547), to the end "that the servant shall be under no risks from imperfect or inadequate machinery, or other material means and appliances." (Laning v. N.Y. Cent. R.R. Co., 49 N.Y. 521,532.) So this is declared to be (Id.) "a duty to be affirmatively and positively fulfilled and performed," and in language governing the case before us is added, "there is not a performance of this duty until there has been placed for the servant's use perfect and adequate physical means, or due care used to that end." (Id.)
The cases cited by the appellant furnish no exception to these rules. In Marsh v. Chickering (101 N.Y. 396), the instrument was perfect of its kind, and so it was in Sweeney v. Berlin Jones En. Co. (101 N.Y. 520), and we held that the master was not bound to procure either the best known or conceivable appliances, or discard an old but sound machine for a new invention. The loss to the plaintiff here resulted neither from lack of a new invention, or a different contrivance, but from a known imperfection resulting from the omission to repair a machine which the defendant was bound to keep in order. For these reasons I cannot concur in the judgment about to be rendered.
All concur with EARL, J., for reversal, except ANDREWS and DANFORTH, JJ., dissenting.
Judgment reversed. *Page 329